# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
4/6/21
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Use of
*(Briefly describe the property to be searched or identify the person by name and address)*

THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (951) 251-9539

Case No. 3:21-mj-132

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute/distribution of controlled substances |
| 21 USC s. 843(b) | use of telephone communication facility |
| 21 USC s. 846 | conspiracy to possess with intent to distribute/distribute controlled substances |

The application is based on these facts:
See Attached affidavit of Ryan Fergot

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I, Brent Tabacchi, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the DEA. See 18 U.S.C. §§ 3122(b), 3123(b).

*Ryan Fergot*
Applicant's signature

Ryan Fergot, SA of the DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means

Via electronic means.
Date: 1:20 PM, Apr 6, 2021

City and state: Dayton, Ohio

*Michael Newman*
Judge's signature

Michael J. Newman, U.S. District Court Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(951) 251-9539** | Case No. _____3:21-mj-132_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, **Ryan Fergot**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(951) 251-9539** ("**Target Telephone**") registered to Juana Elvira Arrechea-Gilbert, 6112 B Wunderlin Ave. Sand Diego, CA, 92114, whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parisippany, New Jersey. The **Target Telephone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the United States Drug Enforcement Administration (DEA), that is, an officer of the United States who is empowered by law to conduct investigations

of and to make arrests for offenses enumerated in Title 21, United States Code, Section 878. The information contained in this Affidavit is either personally known by me or relayed to me by other law enforcement officers involved in this investigation. I have been employed as a Special Agent with the DEA since September 2018. In September 2018, I attended the DEA Academy which consisted of 17 weeks of training in conducting federal drug trafficking investigations; handling confidential sources; conducting undercover operations; conducting mobile, static, foot and electronic surveillance; conducting tactical entry and vehicle arrest operations; using defensive tactics and firearms; as well as additional aspects of conducting DEA lead investigations. I have been assigned to the DEA Dayton Resident Office since April 2019. Prior to employment with the DEA, I was a sworn Law Enforcement Officer of the State of Wisconsin who was charged with the duty to investigate criminal activity and enforce the criminal laws of the State of Wisconsin, and employed by the City of Appleton Police Department from August 2014 to September 2018. During my employment with the Appleton Police Department, I was assigned to the Department's patrol division. During my time as a patrol officer, I conducted retail level drug investigations and I assisted the Appleton Police Department's Community Resource Unit (CRU) which included Narcotics Investigations, Prostitution and Pimping, Human Trafficking, and Criminal Street Gangs.

4. Since the time of my assignment with the DEA, and during time spent as an Appleton Police Officer, I have been involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, and participated in undercover narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually

attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841 (possession with the intent to distribute and to distribute a controlled substance and conspiracy to commit the same); and 21 U.S.C. § 843(b) (use of a communications facility to commit a felony) have been committed, are being committed, and will be committed by Juana Elvira Arrechea-Gilbert, Clemente Quezada, and other known and unknown persons.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. The DEA Dayton Resident Office (DRO) is currently investigating a Dayton, Ohio based fentanyl and methamphetamine drug trafficking organization (DTO).  During this

investigation, DEA has identified Clemente QUEZADA (QUEZADA) as a shipment coordinator and distributor of kilogram quantities of illegal drugs within the Dayton Ohio region.

9. In late January 2021, a reliable confidential source (CS1)[1] provided information to DEA concerning an Hispanic male known to CS1 as "ManMan". According to CS1, this Hispanic male assisted with the distribution of large quantities of fentanyl and methamphetamine in the Dayton, Ohio region. (As detailed below, investigators were able later to identify the Hispanic male as QUEZADA). CS1 informed investigators he/she had met QUEZADA in person and had been recruited to assist find buyers for QUEZADA's fentanyl and methamphetamine. At that time, CS1 advised that QUEZADA anticipated a large shipment of illegal drugs within the next few weeks. In the interim, QUEZADA had access to a large quantity of drugs that allegedly were stored in Columbus, Ohio. QUEZADA told CS1 that he/she could gain access to the drugs in Columbus, but he/she would have to go through QUEZADA to get them.

10. On or around January 26, 2021, CS1 informed investigators that QUEZADA used cellular telephone number (937) 219-9324. CS1 advised that (937) 219-9324 was the number at which he/she regularly contacted QUEZADA. On February 3, 2020, TFO Andy Leininger submitted an Administrative Subpoena to Sprint for phone toll information regarding (937) 219-9324. On the same date, CS1 conducted a recorded phone call to (937) 219-9324. The following is a transcription of the recorded phone conversation between CS1 and an individual that CS1 identified as ManMan, *i.e.,* QUEZADA:

    QUEZADA:   Hello

    CS1:           What's up Poppy?

---

[1] CS1 has been proven reliable through other DEA investigations. CS1 is working for monetary consideration. CS1 CCH includes: Trafficking in Drugs, Domestic Violence and OVI.

QUEZADA: What's up?

CS1: ManMan this is [intentionally omitted].

QUEZADA: (unintelligible) got a new number I see that.

CS1: Yeah yeah you got to rotate them.

QUEZADA: Yeah yeah

CS1: You've been alright?

QUEZADA: Yeah yeah just still waiting man.

CS1: Still waiting?

QUEZADA: Yeah (unintelligible) I'm gonna save this number.

CS1: Ok, that Columbus thing still available?

QUEZADA: Uh, uh I gotta see what's up with it.

CS1: Yeah. Shouldn't be much longer, should it?

QUEZADA: Na, I don't think so, I hope not. If not, they are going to have to wait until I get back.

CS1: Right (overlapping conversation) did you find you a vehicle yet?

QUEZADA: Na na na not yet, I'm doing that when I come back. I'm gonna mess with you on that.

CS1: Ok.

QUEZADA: Yeah yeah.

CS1: Alright, well I was just giving you my new number and checking in with you.

QUEZADA: Alright I appreciate that.

CS1: I'm at the house chillin, ok.

QUEZADA: Alright

11. After the recorded conversation, TFO Leininger conducted a debrief with CS1. CS1 stated that he/she and QUEZADA spoke in coded language during the call. CS1 advised that QUEZADA had explained that the drug shipment had not arrived yet; CS1 inquired if the drugs in Columbus were still available, to which QUEZADA indicated that he would need to

check. QUEZEDA then stated that, if his shipment of drugs did not arrive soon, any drug transaction would have to wait until he gets back. CS1 believed that QUEZEDA was leaving town in the next few days, possibly to travel out of state.

12. Additionally, on or about February 3, 2021, TFO Leininger spoke with TFO Peterson from DEA Cincinnati. TFO Peterson advised that Cincinnati DEA recently obtained information from a cooperating defendant (CD1) about an Hispanic male, only known as "MeMe", later confirmed to be QUEZADA as detailed below. CD1 informed TFO Peterson that the phone number (937) 219-9324 belonged to QUEZADA. CD1 stated QUEZADA was expecting a shipment of approximately 100 pounds of methamphetamine and 20 kilograms of fentanyl to arrive in the Dayton, Ohio, area in the next few weeks. On February 4, 2020, CD1 was shown a driver's license photo of QUEZADA, and CD1 confirmed the picture to be the individual he/she knew as "MeMe".

13. On February 4, 2021, phone tolls from (937) 219-9324 were received from Sprint. Subscriber information identified "Sharmaine Turn" of 1035 Harvard Ave., Fairborn, Ohio as the subscriber of this phone. A query of local law enforcement databases and open source intelligence showed Sharmaine TURNER as recently residing at 1035 Harvard Ave., Fairborn, Ohio. Through the same databases, QUEZADA was identified as recently living at that address as well. Agents ran (937) 219-9324 through a database that law enforcement uses to track money transactions through money remitters, such as Western Union. Information was found that showed QUEZADA has regularly utilized (937) 219-9324 and his name to send money via wire transfer to Mexico. Based on training and experience, affiant knows this to be a common method for quickly laundering small amounts of drug trafficking proceeds to Mexico.

14. On February 4, 2021, DRO investigators showed a driver's license photo of QUEZADA to CS1. CS1 was given no other information other than the photo. CS1 quickly identified the subject as QUEZADA and the individual he/she has been speaking to about illegal drug shipments.

15. On or around February 8, 2021, the DRO conducted a buy/walk operation in which QUEZADA sold 1 kilogram of fentanyl to CS1. (In the days prior to the deal, QUEZADA spoke with CS1 on several occasions via cellular telephone to arrange the transaction, and the pair ultimately agreed to conduct the deal in Beavercreek, Ohio). On or around February 8, 2021, investigators watched QUEZADA drive to various locations in, and around, Fairborn and Beavercreek, Ohio. QUEZADA finally drove to a location in Beavercreek, Ohio, where he met with CS1 and exchanged 1 kilogram of fentanyl for serialized US currency. An electronic audio/video transmitter had also been issued to CS1 by investigators for use during the deal. Through physical surveillance, CS1 confirmation, and the transmitting device, investigators were able to confirm that QUEZADA was the individual who sold CS1 the kilogram of fentanyl.

16. The kilogram of fentanyl obtained from QUEZADA during the buy/walk operation was seized by your affiant, as witnessed by TFO Leininger, from CS1 following the operation. On or around February 8, 2021, TFO Barnes and TFO Hargis transported the kilogram of fentanyl to the Miami Valley Crime Lab for official testing. On or about February 11, 2021, the Miami Valley Crime Lab provided TFO Barnes with an official testing certificate, showing the kilogram of suspected fentanyl tested positive as fentanyl, and had a gross weight of 991.8 grams.

17. On or around February 18, 2021, the DRO utilized CS1 to conduct a meeting with QUEZADA in Fairborn, Ohio. CS1 was equipped with an electronic recording/monitoring device prior to the meeting. During this encounter, which investigators monitored, CS1 provided QUEZADA with money in partial payment for the kilogram of fentanyl that he had delivered earlier in the month. QUEZADA informed CS1 that he anticipated a large shipment of fentanyl and methamphetamine would arrive in the Dayton, Ohio area on or around February 26, 2021.

18. On or about February 23, 2021, investigators conducted surveillance during which QUEZADA met with Elvira ARRECHEA-GILBERT. Based on the events described below (as well as statements QUEZADA later made to CS1), DEA has concluded that, on this day, ARRECHEA-GILBERT delivered bulk amounts of drugs to QUEZADA. Additionally, ARRECHEA-GILBERT appears to have used the **Target Telephone** to facilitate this drug transaction. Specifically:

    a. During the morning of February 23, 2021, information from a court-authorized GPS tracking device on QUEZADA's Nissan showed this vehicle travel from his residence to 2865 E. Sharon Rd, Cincinnati, Ohio. The vehicle remained at the Sharon Road location for a short time and then returned to QUEZADA's house around noon. Roughly an hour later, the vehicle departed the residence and traveled through Miami County, Ohio to Versailles, Ohio.

    b. Miami County Sheriff's Office (MCSO) located the Nissan in its county – specifically at a Sunoco, 1327 E. Main St., Versailles, Ohio. Upon doing so, MCSO maintained physical surveillance of QUEZADA and the Nissan. (TFO Leininger provided MSCO with a driver's license picture of QUEZADA, and the MSCO officer was able positively identify

QUEZADA as the driver and sole occupant of the vehicle).  QUEZADA departed in the Nissan from the Sunoco and began to drive around the area; his driving pattern suggested to MSCO that QUEZADA was unsure of where he was going.  Ultimately, MSCO observed QUEZADA following a semi-trailer truck.  The semi pulled into A1 Weaver Brothers Farm at 10638 SR 47, Versailles, Ohio, and stopped in the driveway.  QUEZADA stopped behind the semi at the edge of the roadway.  Carrying a large white package, the truck driver exited the semi and walked towards QUEZADA's vehicle.  The truck driver gave the package to QUEZADA through the passenger side of the Nissan.  Upon receiving the package, QUEZADA pulled away and left the area.  Investigators tracked QUEZADA as he traveled back to his house at 1035 Harvard. Ave., Fairborn, Ohio.  When QUEZADA arrived at the residence, DEA saw him exit the Nissan carrying a large white bag that appeared to hold a box shaped item within it.  QUEZADA carried the bag into his home.

    c.  Meanwhile, law enforcement watched the semi as it departed A1 Weaver Brother's Farm and returned to the road.  Near Greenville, Ohio, a marked Ohio State Patrol (OSP) unit saw the semi commit a moving violation and stopped it.  During the traffic stop, OSP learned information concerning the truck driver -- Elvira ARRECHEA-GILBERT.  For instance, she showed her California commercial driver's license to OSP, and it identified her as Juana Elvira ARRECHEA-GILBERT.  ARRECHEA-GILBERT also provided her cellular telephone number – namely, the **Target Telephone** – to OSP.  ARRECHA-GILBERT also shared numerous bills of lading including one from the delivery of spas and hot tubs covers to Watson's at 2721 East Sharon Road, Cincinnati, Ohio that day.  It should be noted that the location of this Watson's was approximately ¼ mile from the place on Sharon Road where QUEZADA's Nissan had traveled earlier that day.

    d. Based on my training and experience (and as confirmed by information from CS1), I believe that, during these events, ARRECHEA-GILBERT delivered illegal drugs to QUEZADA.

  19. On or about February 25, 2021, CS1 participated in a consensually monitored and recorded meeting with QUEZADA at a location near Dayton, Ohio. During this meeting, which investigators monitored, QUEZADA indicated that the drug shipment that he had been anticipating had arrived. QUEZADA explained that he had travelled to Cincinnati, Ohio to meet a female courier, but that he only had some of the money needed for the drugs. According to QUEZADA, the female courier was upset and would only provide him with a portion of the drugs. QUEZADA explained that she directed him to meet her again north of Troy, Ohio, where she ultimately provided him with kilograms of fentanyl and fentanyl pills. Based on QUEZADA's statements to CS1, DEA has confirmed that, during the suspicious meeting that occurred near Versailles, Ohio, ARRECHEA-GILBERT provided QUEZADA illegal controlled substances.

  20. Investigators obtained toll records for QUEZADA's telephone number – namely, 937-219-9324 – for February 23, 2021. A review of these records revealed at least 20 contacts between QUEZADA and ARRECHEA-GILBERT's **Target Telephone** on that day. Coupling these tolls with the information concerning the drug transaction that occurred on that day, the **Target Telephone** is being utilized for the transportation and distribution of illegal drugs to the Dayton, Ohio region. Monitoring the location of the **Target Telephone** will assist investigators learn if ARRECHEA-GILBERT returns to this area for possible delivery of additional controlled substances. This information also will assist DEA identify patterns of

travel and additional possible locations where ARRECHEA-GILBERT may be delivering drugs.

21. On March 9, 2021, DRO investigators applied for and were granted a search warrant to collect GPS location data on the **TARGET TELEPHONE.** While that search warrant was active, the **TARGET TELEPHONE** contacted QUEZADA's telephone number – namely, 937-219-9324, five times on March 24, 2021. All five contacts were phone calls and only one was not completed. Based on QUEZADA's prior meeting with ARRECHIA-GILBERT, I believe that their contacts with one another generally serve as a prelude to drug trafficking activity – either the delivery of drugs or the collection of drug proceeds in southern Ohio. Specifically, a review of telephone tolls records between QUEZADA's telephone and the **TARGET TELEPHONE** reveal that they are in contact in concentrated clusters several weeks apart. Based on QUEZADA's past statements to CS1, these contacts generally have occurred surrounding delivery of a drug shipment by **ARRECHIA-GILBERT.** In short, contact between QUEZADA and the TARGET TELEPHONE tends to presage a drug shipment.

22. During the previous collection of court-authorized GPS data, **TARGET TELEPHONE** did not travel to the Southern District of Ohio. As noted above, her previous delivery of drugs occurred in late February 2021. **TARGET TELEPHONE** had contact with QUEZADA during late March 2021. This chain of events suggests that the holder of **TARGET TELEPHONE, ARRECHIA-GILBERT,** will travel to the Southern District of Ohio in the near future to pick up money and to deliver illegal narcotics to QUEZADA in the near future.

23. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information

about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

24. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Telephone**, including by initiating a signal to determine the location of the **Target Telephone** on Sprint network or with such other reference points as may be reasonably available.

25. Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Telephone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and

retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

26. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

27. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Telephone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

28. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information

described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

29. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Telephone** outside of daytime hours.

Respectfully submitted,

*Ryan Fergot*

Ryan M. Fergot
Special Agent
Drug Enforcement Administration

1:21 PM, Apr 6, 2021

Sworn to and affirmed before me on_____, 2021

*Michael Newman*

_____
HONORABLE MICHAEL J. NEWMAN
UNITED STATES DISTRICT COURT JUDGE

**Via electronic means.**

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **(951) 251-9539,** subscribed to in the name of Juana Elvira Arrechea-Gilbert, at 6112 B Wunderlin Ave. Sand Diego, CA, 92114, (the "**Target Telephone**"), whose wireless service provider is T-Mobile, a company headquartered 4 Sylvan Way, Parisippany, New Jersey

2. Records and information associated with the **Target Telephone** that is within the possession, custody, or control of T-Mobile including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

All information about the location of the **Target Telephone** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Telephone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.     Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846 and 841 (possession with the intent to distribute and to distribute a controlled substance and conspiracy to commit the same); and 21 U.S.C. § 843(b) (use of a communications facility to commit a felony) involving Juana Elvira Arrechea-Gilbert, and others known and unknown to the government.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.